# EXHIBIT 1

PDF processed with CutePDF evaluation edition www.CutePDF.com

Bk 22224 Pg219   #35864
03-29-2005 @ 09:51a

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY
_Miller P O'Donnell_
WILLIAM R O'DONNELL, REGISTER

After Recording Return To:
OPTIMA MORTGAGE CORPORATION
15941 REDHILL AVENUE SUITE #100
TUSTIN, CALIFORNIA 92780
Loan Number: 0640520008

Prepared By:
Optima Mortgage Corp
15941 Redhill Ave Suite #100
Tustin, CA 92780

_Record Return to:_
TransContinental Title Co.
2203 Tampa Rd Suite 101
Oldsmar, FL 34677
800-225-7897

[Space Above This Line For Recording Data]

# MORTGAGE

D-233107-20+
T-466289-20+

MIN: 1002547-0640520008-3

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JUNE 22, 2004                    , together with all Riders to this document.

(B) "Borrower" is PAUL JONES A unmarried person

_79#70-42_

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is OPTIMA MORTGAGE CORPORATION

Lender is a CALIFORNIA CORPORATION                                                       organized and existing under the laws of CALIFORNIA
Lender's address is 15941 REDHILL AVENUE SUITE #100, TUSTIN, CALIFORNIA 92780

(E) "Note" means the promissory note signed by Borrower and dated JUNE 22, 2004
The Note states that Borrower owes Lender TWO HUNDRED SEVENTY-FOUR THOUSAND FIVE HUNDRED FIFTY AND 00/100          Dollars (U.S. $ 274,550.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JULY 1, 2034

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

Borrower Initials: _P J_

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   DocMagic ℮Forms 800-649-1362
Form 3022 01/01                                        Page 1 of 13                                              www.docmagic.com

572 PARK ST, STOUGHTON

20

BK 22224  Pg 220 #35864

(H)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☒ Other(s) [specify]
☐ 1-4 Family Rider    ☐ Biweekly Payment Rider    PREPAYMENT RIDER TO SECURITY INST

(I)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)  "Escrow Items" means those items that are described in Section 3.

(M)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY of NORFOLK

[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]

Borrower Initials:

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    DocMagic 800-649-1362
Form 3022 01/01      Page 2 of 13      www.docmagic.com

k 22224  Pg 221 #35864

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: MAP 70 MAP 42

which currently has the address of  572 PARK STREET
                                                          [Street]
STOUGHTON                        , Massachusetts  02072              ("Property Address"):
        [City]                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due

Borrower Initials: ____

under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   Application of Payments or Proceeds.  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   Funds for Escrow Items.  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Borrower Initials: _____

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance.   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such

Borrower Initials: _____  _____  _____  _____  _____

policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal

Borrower Initials: _P_J_  _____ _____ _____ _____ _____ _____

proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance.   If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share

Borrower Initials: _R.J._

⌐K 22224  Pg 226 #35864

of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

Borrower Initials: P.J.  _____  _____  _____

_____  _____  _____  _____

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Borrower Initials: _____ _____ _____ _____ _____ _____

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations

Borrower Initials: P.J _____ _____ _____ _____ _____

to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be

Borrower Initials:

k 22224  Pg 229 #35864

entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)  
PAUL JONES          -Borrower

_____ (Seal)  
                    -Borrower

_____ (Seal)  
                    -Borrower

_____ (Seal)  
                    -Borrower

_____ (Seal)  
                    -Borrower

_____ (Seal)  
                    -Borrower

Witness:                Witness:

Lori A. Mead           Jack Smith  
Witness                Jack Smith

Commonwealth of Massachusetts

County of ~~NORFOLK~~ Hampshire

On this 9 ᵗʰ day of June, 2008 , before me, the undersigned notary public,

personally appeared PAUL JONES An unmarried person

proved to me through satisfactory evidence of identification, which were _____

to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she)
signed it voluntarily for its stated purpose.

☐ (as partner for _____
      a corporation)

☐ (as _____                                      for                          , a corporation)

☐ (as attorney in fact for
      the principal)

☐ (as _____                                      for
                                                                                    , (a) (the)
                                                                                              (

_____
Lori A. Mead
Notary Public (Printed Name)

Oᵉᶜ 19, 2008
My commission expires:

(Seal)                                                          My commission expires:

LORI A. MEAD
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires Dec. 19, 2008

Pg 231 #35864  "JK 22224

## EXHIBIT "A"

10-00466289

THE LAND IN STOUGHTON WITH THE BUILDINGS THEREON, ON
THE NORTHEASTERLY SIDE OF PARK STREET, AND BOUNDED:

BEGINNING ON PARK STREET AT A POINT SEVENTY-FIVE (75)
FEET NORTHERLY FROM LAND NOW OR LATE OF OLD COLONY
RAILROAD COMPANY, NOW OR FORMERLY OCCUPIED BY THE
STOUGHTON LUMBER COMPANY; THENCE RUNNING
NORTHEASTERLY BY LAND NOW OR FORMERLY OF AUGUST O.
LINDELOF AND EMMA J. LINDELOF BY A LINE PARALLEL WITH
AND SEVENTY-FIVE (75) FEET DISTANCE FROM SAID
RAILROAD LAND ONE HUNDRED AND FIFTY (150) FEET TO A
CORNER; THENCE RUNNING NORTHERLY BY SAID AUGUST O.
LINDELOF AND EMMA J. LINDELOF LAND BY A LINE PARALLEL
WITH PARK STREET ONE HUNDRED AND TEN FEET TO A
CORNER; THENCE RUNNING SOUTHWESTERLY BY LAND NOW OR
FORMERLY OF SAID AUGUST O. LINDELOF AND EMMA J.
LINDELOF BY A LINE PARALLEL WITH THE FIRST COURSE ONE
HUNDRED AND FIFTY (150) FEET TO PARK STREET; THENCE
SOUTHERLY BY PARK STREET ONE HUNDRED AND TEN (110)
FEET TO POINT OF BEGINNING.

ALSO:

A CERTAIN PARCEL OF LAND SITUATE IN SAID STOUGHTON,
MASS., AND BEING LOT 3 AS SHOWN ON A PLAN ENTITLED
"PLAN OF LAND IN STOUGHTON, MASS.", DATED JANUARY 18,
1968, DULY RECORDED, CONTAINING ACCORDING TO SAID
PLAN 7,691 SQUARE FEET.

ALSO:

A CERTAIN PARCEL OF LAND SITUATED ON THE
NORTHEASTERLY SIDE OF PARK STREET IN SAID STOUGHTON,
MASSACHUSETTS AND BEING DESCRIBED AS FOLLOWS:

BEGINNING AT A STAKE ON THE SOUTHERLY CORNER OF LAND
OF "RUTH E. CURTIS" AND BEING SHOWN ON A PLAN

## EXHIBIT "A"

ENTITLED "PLAN OF LAND IN STOUGHTON, MASS." DATED
JANUARY 18, 1968 AND RECORDED WITH NORFOLK DEEDS,
BOOK 4490, PAGE 69, THENCE RUNNING BY PARK STREET AS
SHOWN ON SAID PLAN, S 40 DEGREES 54 MINUTES 11
SECONDS E, 75 FEET TO A STAKE;

THENCE TURNING AND RUNNING N 46 DEGREES 19 MINUTES 29
SECONDS E 220 FEET TO A POINT;

THENCE TURNING AT AN APPROXIMATE RIGHT ANGLE AND
RUNNING NORTHWESTERLY A DISTANCE OF 75 FEET, MORE OR
LESS, TO A POINT AT THE NORTHEASTERLY CORNER OF
DISTANCE 75 FEET, MORE OR LESS, TO A POINT AT THE
NORTHEASTERLY CORNER OF LOT 3 SHOWN ON SAID PLAN,
SAID POINT BEING DESIGNATED ON SAID PLAN AS "C.B. TO
BE SET,";

THENCE TURNING AND RUNNING BY LOT 3 AND LAND OF "RUTH
E. CURTIS" AS SHOWN ON SAID PLAN, S 46 DEGREES 19
MINUTES 29 SECONDS W., 220 FEET TO THE POINT OF
BEGINNING.

BEING THE SAME PROPERTY CONVEYED TO PAUL JONES BY
DEED FROM EDWARD G. MATTINGLY AND ELAINE R. MATTINGLY
RECORDED 06/21/2002 IN DEED BOOK 16766, PAGE 1, IN
THE REGISTRY OF DEEDS PLAN FOR NORFOLK COUNTY,
MASSACHUSETTS.

BK 22224   Pg 234   #35864

Min: 1002547-0640520008-3          Loan Number: 0640520008

# ADJUSTABLE RATE RIDER
## (6-Month LIBOR Index - Rate Caps)
### (Assumable during Life of Loan) (First Business Day of Preceding Month Lookback)

THIS ADJUSTABLE RATE RIDER is made this 22nd day of JUNE, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to OPTIMA MORTGAGE CORPORATION, A CALIFORNIA CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

572 PARK STREET, STOUGHTON, MASSACHUSETTS 02072
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of   7.450 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the 1st   day of JULY, 2006 and may change on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

Borrower Initials: _____   _____   _____

MULTISTATE ADJUSTABLE RATE RIDER - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 5120 2/04                    Page 1 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **SIX AND 950/1000** percentage point(s) (     6.950   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    8.950 % or less than  6.950  %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE AND 500/1000** percentage point(s) (     1.500   %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than    14.450 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

Borrower Initials: _P.J_ _____ _____ _____ _____

MULTISTATE ADJUSTABLE RATE RIDER - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family—Freddie Mac MODIFIED INSTRUMENT
Form 5120 3/04                                   Page 2 of 3

DocMagic eForms  800-649-1362
www.docmagic.com

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Paul Jones_ _____ (Seal)
PAUL JONES                      -Borrower

_____ (Seal)
                  -Borrower

_____ (Seal)
                  -Borrower

_____ (Seal)
                  -Borrower

_____ (Seal)
                  -Borrower

_____ (Seal)
                  -Borrower

MULTISTATE ADJUSTABLE RATE RIDER – 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family–Freddie Mac MODIFIED INSTRUMENT
Form 5120 3/04                    Page 3 of 3

DocMagic ☎800-649-1362
www.docmagic.com

ĸ 22224   Pg 237 #35864

# PREPAYMENT RIDER

Loan Number: 0640520008

Date: JUNE 22, 2004

Borrower(s): PAUL JONES

THIS PREPAYMENT RIDER (the "Rider") is made this 22nd   day of JUNE   ,
2004   , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of
OPTIMA MORTGAGE CORPORATION

("Lender").  The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at

572 PARK STREET, STOUGHTON, MASSACHUSETTS 02072

[Property Address]

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.    PREPAYMENT CHARGE**
The Note provides for the payment of a prepayment charge as follows:

5    .  **BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**
I have the right to make payments of Principal at any time before they are due.
A payment of Principal only is known as a "Prepayment."  When I make a Prepayment,
I will tell the Note Holder in writing that I am doing so.  I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.
The Note Holder will use my Prepayments to reduce the amount of Principal that
I owe under the Note.  However, the Note Holder may apply my Prepayment to the
accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be
no changes in the due dates of my monthly payment unless the Note Holder agrees in
writing to those changes.
If the Note provides for changes in the interest rate, my partial Prepayment may
reduce the amount of my monthly payments after the first Change Date following my
partial Prepayment.  However, any reduction due to my partial Prepayment may be offset
by an interest rate increase.

P.J.

Bk 22224   Pg 238 #35864

If I make a full Prepayment of the Note before the date fixed for payment, I will at the same time pay a Prepayment charge equal to the balance of the first year's interest or three (3) months' interest, whichever is less; provided, however, that if I make a full Prepayment within   TWENTY-FOUR
(24      ) months from the date of the Note for the purpose of refinancing with another financial institution, I will pay an additional Prepayment charge equal to three (3) months' interest.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

_____ (Seal)            _____ (Seal)
PAUL  JONES                               -Borrower                                                        -Borrower

_____ (Seal)            _____ (Seal)
                                                  -Borrower                                                        -Borrower

_____ (Seal)            _____ (Seal)
                                                  -Borrower                                                        -Borrower

# EXHIBIT 2

**Countrywide**
HOME LOANS
P.O. Box 660694
Dallas, TX 75266-0694

Business Address:
7105 Corporate Drive
Plano, TX 75024-4100

Send Payments to:
PO Box 660694
Dallas, TX 75266-0694

August 2, 2005

Paul Jones
572 PARK ST
STOUGHTON, MA 02072-3645

Account No.: 59231592
Property Address:
572 Park Street
Stoughton, MA 02072

## NOTICE OF DEFAULT AND ACCELERATION

Dear Paul Jones:

Countrywide Home Loans Servicing LP (hereinafter "Countrywide") services the home loan described above on behalf of the holder of the promissory note (the "Noteholder"). The loan is in serious default because the required payments have not been made. The total amount now required to reinstate the loan as of the date of this letter is as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| Monthly Payments: | 07/01/2005 | - | 08/31/2005 | @ | $1,988.26 | $3,976.52 |
| Late Charges: | 07/01/2005 | - | 07/31/2005 | @ | $57.31 | $57.31 |
| Other Charges: | Total Late Charges: | | | | | $0.00 |
| | Uncollected Costs: | | | | | $12.50 |
| | Partial Payment Balance: | | | | | ($0.00) |
| | | | TOTAL DUE: | | | $4,046.33 |

You have the *right* to cure the default. To cure the default, on or before September 1, 2005, Countrywide must receive the amount of $4,046.33 plus any additional regular monthly payment or payments, late charges, fees and charges, which become due on or before September 1, 2005.

The default will not be considered cured unless Countrywide receives "good funds" in the amount $4,046.33 on or before September 1, 2005. If any check (or other payment) is returned to us for insufficient funds or for any other reason, "good funds" will not have been received and the default will not have been cured. No extension of time to cure will be granted due to a returned payment. Countrywide reserves the right to accept or reject a partial payment of the total amount due without waiving any of its rights herein or otherwise. For example, if less than the full amount that is due is sent to us, we can keep the payment and apply it to the debt but still proceed to foreclosure since the default would not have been cured.

If the default is not cured on or before September 1, 2005, the mortgage payments will be accelerated with the full amount remaining accelerated and becoming due and payable in full, and foreclosure proceedings will be initiated at that time. As such, the failure to cure the default may result in the foreclosure and sale of your property. If your property is foreclosed upon, the Noteholder may pursue a deficiency judgment against you to collect the balance of your loan, if permitted by law.

You may, if required by law or your loan documents, have the right to cure the default after the acceleration of the mortgage payments and prior to the foreclosure sale of your property if all amounts past due are paid within the time permitted by law. However, Countrywide and the Noteholder shall be entitled to collect all fees and costs incurred by Countrywide and the Noteholder in pursuing any of their remedies, including but not limited to reasonable attorney's fees, to the full extent permitted by law. Further, you may have the right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and foreclosure.

Your loan is in default. Pursuant to your loan documents, Countrywide may, enter upon and conduct an inspection of your property. The purposes of such an inspection are to (i) observe the physical condition of your property, (ii) verify that the property is occupied and/or (iii) determine the identity of the occupant. If you do not cure the default prior to the inspection, other actions to protect the mortgagee's interest in the property (including, but not limited to, winterization, securing the property, and valuation services) may be taken. The costs of the above-described inspections and property preservation efforts will be charged to your account as provided in your security instrument.

If you are unable to cure the default on or before September 1, 2005, Countrywide wants you to be aware of various options that may be available to you through Countrywide to prevent a foreclosure sale of your property. For example:

- Repayment Plan: It is possible that you may be eligible for some form of payment assistance through Countrywide.

Please write your account number on all checks and correspondence. [illegible]

Account Number: 59231592-3
Paul Jones
572 Park Street

Balance Due for charges listed above: $4,046.33 as of 8/2/2005.

We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

[illegible]

Countrywide
PO BOX 660694
Dallas, TX 75266-0694

0592315923000004046330004046 33

BNY000064

# EXHIBIT 3

Bk 25529 Pg357 #16183
02-25-2008 @ 11:25a

**COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**

N O T
A N
T R I A L
C O P Y

Land Court Use Only

LET JUDGMENT ISSUE: January 30, 07

N O T
A N
O F ~~Karyn McClain~~
C O P Y

Chief Justice

SUFFOLK                                                    ss.                                  Case No.

## COMPLAINT TO FORECLOSE MORTGAGE

**PLAINTIFF:**
**Name**

Bank of New York as Trustee for the
Certificate Holders, CWABS, Inc., Asset-
Backed Certificates, Series 2004-7

**City or Town**
**of Residence**

Simi Valley, CA

06 MISC 333503

LAND COURT FILED
06 NOV -6 AM 10:34

**DEFENDANT:**
**Name**
Paul Jones

**City or Town**
**of Residence**
Stoughton

**Interest**

Owner

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY

~~William P. O'Donnell~~
WILLIAM P. O'DONNELL, REGISTER

1.   Your Plaintiff is the owner (or assignee) and holder of a mortgage with the statutory power of sale given by

Paul Jones

to MERS, as nominee for Optima Mortgage Corporation

                                                                                         dated

June 22, 2004

recorded at Norfolk County Registry of Deeds   Book 22224 Page 219

covering *572 Park Street, Stoughton

                                                            (street and number)

                                                            (and city or town)
                                                            (Unit No. and Condo.
                                                            Name if a Condominium)

and more particularly described in said mortgage

**LAND COURT USE ONLY**

### JUDGMENT

Under the provisions of the Servicemembers Civil Relief Act, this cause came on to be heard and thereupon, upon consideration thereof, it appearing to the Court that the record owner is not entitled to the benefits of said Act, it is

ORDERED and ADJUDGED that the plaintiff be authorized and empowered to make an entry and to sell the property covered by the mortgage as set forth in this complaint in accordance with the powers contained in said mortgage.

By the Court.
Attest:

A TRUE COPY
ATTEST:

*Deborah J. Patterson*

*Deborah J. Patt*

DEBORAH J. PATTERSON
RECORDER DP

(SEAL)

RECORDED

NOTE:   Whenever the singular is used herein, it shall be deemed to mean and include the plural where applicable.
*A metes and bounds description to the property is not necessary.

FORM LCB-4-(9/5)

LcP-11-9/05

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In re
    PAUL M. JONES

| | |
|---|---|
| COUNTRYWIDE HOME LOANS, INC. }| Chapter 13 |
| MOVANT }| Case No. 07-10729-JNF |
| } | |
| v. } | |
| } | |
| PAUL M. JONES } | |
| DEBTOR } | |

## MOTION FOR RELIEF FROM STAY

To the Honorable Joan N. Feeney, Bankruptcy Judge:

NOW COMES Countrywide Home Loans, Inc. (hereinafter "the Movant"), by and through its attorneys, Ablitt & Charlton, P.C., and moves for relief from the automatic stay pursuant to 11 U.S.C. § 362 (d), Bankruptcy Rules 4001 and 9014 and MLBR 4001-1. In support thereof, your Movant states as follows:

### I.   PARTIES & JURISDICTION

1.   This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § § 1334 and 157(a) and 157(b)(2)(G).   This case is a core proceeding in accordance with 28 U.S.C. § 157 (b).

2.   The Movant's mailing address is 7105 Corporate Drive, PTX-B-209, Plano, Texas 75024.

3.   Paul M. Jones (hereinafter referred to as the "Debtor") has a mailing address of 572 Park Street, Stoughton, Massachusetts 02072.

### II.   RELEVANT FACTS

4.   On February 7, 2007, the Debtor filed a petition under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Massachusetts.

5.   The Movant is the present holder of a Mortgage on the Debtor's real estate in the original amount of $274,550.00 given by Paul Jones to Mortgage Electronic Registration Systems, Inc. as nominee for Optima Mortgage Corporation on or about June 22, 2004.  Said mortgage is recorded with the Norfolk County Registry of Deeds at Book 22224, Page 219 and encumbers the premises located at 572 Park Street, Stoughton, Massachusetts 02072.  A copy of the mortgage is annexed hereto and marked as *Exhibit 'A'*.

6.   Said mortgage secures a Note given by Paul Jones to Optima Mortgage Corporation in the original amount of $274,550.00.

7.   There is no other collateral securing the obligation.

8.   As of May 11, 2007, approximately $304,800.90 is due and owing under the terms and conditions of said Note and Mortgage.

9.   Upon information and belief, there are no other outstanding secured encumbrances on the subject property.

10.  The total amount of the secured encumbrances on the property is approximately $304,800.90.

11.  According to Schedule "D", the fair market value (FMV) of the subject property is $355,000.00.  The liquidation value,

2

calculated at Seventy Percent (70%) of the FMV, is $248,500.00. The liquidation value (LV) of the property, calculated by deducting reasonable and necessary expenses from the FMV, yields $323,821.20 and is comprised as follows:

| | |
|---|---|
| Debtor's Estimate of FMV: | $ 355,000.00 |
| Less: | |
| Realtors' fees at (6) percent: | 21,300.00 |
| Tax deed stamps: | 1,618.80 |
| Anticipated closing costs: | 750.00 |
| Eviction proceedings: | 710.00 |
| Property maintenance costs: | 1,000.00 |
| Estimated foreclosure fees and costs: | 5,000.00 |
| Bankruptcy fees and costs: | 800.00 |
| | $ 323,821.20 |

13.   Notwithstanding the above, the Movant reserves the right to request access to the property for the purpose of conducting an interior appraisal to more accurately quantify its value, in the event that the value of said property is contested by the debtor.

14.   The Debtor has equity in the property.

15.   The monthly mortgage payment of $3,281.47 is due on the first of every month.

16.   The Debtor has failed to remain current with the regular post-petition mortgage payments.

17.   As of May 11, 2007, the Debtor is due for one (1) mortgage payment of $3,340.37 for the month of March 2007; two (2) mortgage payments of $3,281.47 each for the months of April 2007 through May 2007, for a total of $6,562.94; for a total amount of $9,903.31.

3

18. The Debtor is also due for Property Inspection fee of $198.00; Foreclosure Attorney's Fees of $1,125.00; Foreclosure Costs of $4,814.30 and for Miscellaneous fees of $364.87, for a total of $6,502.17.

19. The Movant has also incurred attorney's fees and costs relative to this Motion for Relief in the amount of $800.00 and is entitled to reimbursement for those fees pursuant to its contract and in accordance with 11 U.S.C. § 506(b).

20. The total post-petition arrearage due as of May 11, 2007, is $17,205.48 and the Movant anticipates the post-petition arrearage by the time of the hearing will be $20,486.95.

## III. ARGUMENT

The Movant seeks relief from the automatic stay on the following grounds:

A. LACK OF ADEQUATE PROTECTION
   11 U.S.C. § 362 (d)(1)

21. The Debtor is either unable or unwilling to offer the Movant adequate protection in the form of regular monthly mortgage payments, and pursuant to 11 U.S.C. § 362 (d)(1), cause exists to grant relief from the automatic stay on that basis.

WHEREFORE, the Movant prays that:

A. Countrywide Home Loans, Inc. and its successors and/or assigns, be granted relief from the automatic stay for the purpose of exercising its rights under its agreements with the debtors and under applicable law, including, without limitation, taking possession of the mortgaged premises and/or foreclosing or

accepting a deed in lieu of foreclosure of its mortgage on said premises, and bringing such actions, including, without limitation, eviction proceedings, as are permissible by applicable law; or,

B.   In the alternative, for an Adequate Protection Order requiring that: (1) The Debtor becomes current with the post-petition obligations due under the Note and Mortgage, including but not limited to, taxes and insurance, late charges and legal fees and costs and, (2) That if the Debtor should fail to comply with the Adequate Protection Order, that the Movant may file a Motion, pursuant to MLBR 9013-1, with an Affidavit of Non-Compliance, and that the Court may grant Relief from the Automatic Stay without a hearing; and,

C.   The Court order such other and further relief as it deems just and proper.

<div style="margin-left: 40%">

Respectfully submitted,
The Movant
By its Attorneys,

ABLITT & CHARLTON, P.C.

</div>

DATED: May 17, 2007                    /s/ Deirdre Cavanaugh
                                       Deirdre Cavanaugh
                                       (BBO 638732)
                                       92 Montvale Avenue, Suite 2950
                                       Stoneham, MA 02180
                                       781-246-8995

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing MOTION FOR RELIEF by mailing a copy first-class, postage prepaid or by serving electronically via CM/ECF, to the following parties pursuant to Bankruptcy Rules 2002, 4001 and 5005 and MLBR's 2002-1,4001-1 and 9013-3:

DATED: May 17, 2007                    /s/ Deirdre Cavanaugh

**Paul M. Jones**
572 Park Street
Stoughton, MA 02072

**John F. Cullen**
Law Office of John F. Cullen, P.C.
17 Accord Park
Suite 103
Norwell, MA 02061

**John Fitzgerald**
Office of the US Trustee
10 Causeway Street
Boston, MA 02222

**Carolyn Bankowski**
Chapter 13 Trustee Boston
P. O. Box 8250
Boston, MA 02114

**Bay State Gas**
PO Box 830012
Baltimore, MD 21283

**Internal Revenue Service**
c/o Eugina Gomes, BK Specialis
380 Westminster Mall
Providence, RI 02903

**Internal Revenue Service**
1 Montvale Avenue
Stoneham, MA 02180

**MDOR**
Department of Revenue
BK Unit PO Box 9564
Boston, MA 02114

6

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In re
   PAUL M. JONES

| | |
|---|---|
| BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATE HOLDERS, CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2004-7, MOVANT | } } } } } } | Chapter 13 Case No. 07-10729-JNF |
| v. | } } } |
| PAUL M. JONES DEBTOR | } } |

## MOTION FOR RELIEF FROM STAY

To the Honorable Joan N. Feeney, Bankruptcy Judge:

NOW COMES Bank of New York as Trustee for the Certificate Holders, CWABS, Inc., Asset-Backed Certificates, Series 2004-7 (hereinafter "the Movant"), by and through its attorneys, Ablitt & Charlton, P.C., and moves for relief from the automatic stay pursuant to 11 U.S.C. § 362 (d), Bankruptcy Rules 4001 and 9014 and MLBR 4001-1. In support thereof, your Movant states as follows:

### I.    PARTIES & JURISDICTION

1.   This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § § 1334 and 157(a) and 157(b)(2)(G).  This case is a core proceeding in accordance with 28 U.S.C. § 157 (b).

2.   The Movant's mailing address is c/o Countrywide Home Loans, Inc., 7105 Corporate Drive, PTX-B-209, Plano, Texas 75024.

3.    Paul M. Jones (hereinafter referred to as the "Debtor") has a mailing address of 572 Park Street, Stoughton, Massachusetts 02072.

## II.  RELEVANT FACTS

4.    On February 7, 2007, the Debtor filed a petition under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Massachusetts.

5.    The Movant is the present holder of a Mortgage on the Debtor's real estate in the original amount of $274,550.00 given by Paul Jones to Mortgage Electronic Registration Systems, Inc. as nominee for Optima Mortgage Corporation on or about June 22, 2004.  Said mortgage is recorded with the Norfolk County Registry of Deeds at Book 22224, Page 219 and encumbers the premises located at 572 Park Street, Stoughton, Massachusetts 02072.  A copy of the mortgage is annexed hereto and marked as *Exhibit 'A'*. Reference is further made to an assignment of mortgage executed by Mortgage electronic Registration Systems, Inc. as nominee for Optima Mortgage Corporation to the Movant dated November 20, 2006 to be recorded forthwith. A copy of the assignment of mortgage is annexed hereto and marked as Exhibit *'B'*.

6.    Said mortgage secures a Note given by Paul Jones to Optima Mortgage Corporation in the original amount of $274,550.00.

7.    There is no other collateral securing the obligation.

2

8.   As of July 27, 2007, approximately $311,019.38 is due and owing under the terms and conditions of said Note and Mortgage.

9.   Upon information and belief, there are no other outstanding secured encumbrances on the subject property.

10.   The total amount of the secured encumbrances on the property is approximately $311,019.38.

11.   According to Schedule "A", the fair market value (FMV) of the subject property is $335,000.00.  The liquidation value (LV) of the property, calculated by deducting reasonable and necessary expenses from the FMV, yields $306,912.40 and is comprised as follows:

| | |
|---|---|
| Debtor's Estimate of FMV:<br>  Less: | $ 335,000.00 |
| Realtors' fees at (6) percent: | 20,100.00 |
| Tax deed stamps: | 1,527.60 |
| Anticipated closing costs: | 750.00 |
| Eviction proceedings: | 710.00 |
| Estimated foreclosure fees and costs: | 5,000.00 |
| TOTAL | $ 306,912.40 |

Paul Jones recorded a Declaration of Homestead with the Norfolk County Registry of Deeds in Book 16982, Page 445.

13.   Notwithstanding the above, the Movant reserves the right to request access to the property for the purpose of conducting an interior appraisal to more accurately quantify its value, in the event that the value of said property is contested by the Debtor.

14.   The Debtor has no equity in the property.

3

15.   The monthly mortgage payment of $3,281.47 is due on the first of every month.

16.   The Debtor has failed to remain current with the regular post-petition mortgage payments.

17.   As of August 3, 2007, the Debtor is due for three (3) mortgage payments of $3,281.47 each for the months of June 2007 through August 2007, for a total of $9,844.41.

18.   The Movant has also incurred attorney's fees and costs relative to this Motion for Relief in the amount of $800.00 and is entitled to reimbursement for those fees pursuant to its contract and in accordance with 11 U.S.C. § 506(b).

19.   The total post-petition arrearage due as of August 3, 2007, is $10,644.41 and the Movant anticipates the post-petition arrearage by the time of the hearing will be $13,925.88.

### III. <u>ARGUMENT</u>

The Movant seeks relief from the automatic stay on the following grounds:

A.   <u>LACK OF ADEQUATE PROTECTION</u>
     <u>11 U.S.C. § 362 (d)(1)</u>
     20.   The Debtor is either unable or unwilling to offer the Movant adequate protection in the form of regular monthly mortgage payments, and pursuant to 11 U.S.C. § 362 (d)(1), cause exists to grant relief from the automatic stay on that basis.

B.   <u>DEBTOR'S LACK OF EQUITY AND THAT PROPERTY IS NOT NECESSARY</u>
     <u>TO AN EFFECTIVE REORGANIZATION PURSUANT TO 11 U.S.C. § 362</u>
     <u>(d)(2)(A)</u>
     <u>and (B)</u>

4

21. The subject property has a fair market value of $335,000[1] and an approximate liquidation value of $306,912.40.

22. The subject property is subject to the Movant's secured interest of $311,019.38.

23. The Debtor does not appear to have any equity in the subject property.

24. The subject property is not necessary to an effective reorganization.

25. Pursuant to 11 U.S.C. § 362 (d)(2)(A) and (B), cause exists to grant relief from the automatic stay on these grounds.

WHEREFORE, the Movant prays that:

A. Bank of New York as Trustee for the Certificate Holders, CWABS, Inc., Asset-Backed Certificates, Series 2004-7 and its successors and/or assigns, be granted relief from the automatic stay for the purpose of exercising its rights under its agreements with the debtors and under applicable law, including, without limitation, taking possession of the mortgaged premises and/or foreclosing or accepting a deed in lieu of foreclosure of its mortgage on said premises, and bringing such actions, including, without limitation, eviction proceedings, as are permissible by applicable law; or,

B. In the alternative, for an Adequate Protection Order requiring that: (1) The Debtor becomes current with the post-petition obligations due under the Note and Mortgage, including

---

[1] Pursuant to Debtor's Schedules.

but not limited to, taxes and insurance, late charges and legal fees and costs and, (2) That if the Debtor should fail to comply with the Adequate Protection Order, that the Movant may file a Motion, pursuant to MLBR 9013-1, with an Affidavit of Non-Compliance, and that the Court may grant Relief from the Automatic Stay without a hearing; and,

C.    The Court order such other and further relief as it deems just and proper.

                              Respectfully submitted,
                              The Movant
                              By its Attorneys,


                              ABLITT & CHARLTON, P.C.


DATED: August 8, 2007        /s/ Rachel D. Costa
                             Rachel D. Costa
                             (BBO 657550)
                             92 Montvale Avenue, Suite 2950
                             Stoneham, MA 02180
                             781-246-8995

6

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing MOTION FOR RELIEF by mailing a copy first-class, postage prepaid or by serving electronically via CM/ECF, to the following parties pursuant to Bankruptcy Rules 2002, 4001 and 5005 and MLBR's 2002-1,4001-1 and 9013-3:

DATED: August 8, 2007                 /s/ Rachel D. Costa
                                       Rachel D. Costa

**Paul M. Jones**                     **Internal Revenue Service**
572 Park Street                       c/o Eugina Gomes, BK Specialis
Stoughton, MA 02072                   380 Westminster Mall
                                      Providence, RI 02903
**John F. Cullen**
Law Office of John F. Cullen,         **Internal Revenue Service**
P.C.                                  1 Montvale Avenue
17 Accord Park                        Stoneham, MA 02180
Suite 103
Norwell, MA 02061                     **MDOR**
                                      Department of Revenue
**John Fitzgerald**                   BK Unit PO Box 9564
Office of the US Trustee              Boston, MA 02114
10 Causeway Street
Boston, MA 02222                      **National Grid**
                                      Processing Center
**Carolyn Bankowski**                 Woburn , MA 01807-0005
Chapter 13 Trustee Boston
P. O. Box 8250                        **Town of Stoughton Water Dept.**
Boston, MA 02114                      10 Bearl Street
                                      Stoughton, MA 02072
**Bay State Gas**
PO Box 830012
Baltimore, MD 21283

# EXHIBIT 6

# ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS, that MERS, as nominee for Optima Mortgage Corporation, which is organized and existing under the laws of United States of America

FOR VALUE RECEIVED, hereby grants, assigns and transfers to

Bank of New York as Trustee for the Certificate Holders, CWABS, Inc., Asset-Backed Certificates, Series 2004-7, located in  Simi Valley, CA 93065

All of the right, title, interest of said that MERS, as nominee for Optima Mortgage Corporation in and to and under that certain Mortgage dated June 22, 2004, executed by Paul Jones and recorded with Norfolk County () Registry of Deeds at Book 22224, Page 219, describing the land therein as 572 Park Street, Stoughton, MA 02072, and further described in the Exhibit "A" attached hereto and made a part hereof;

TOGETHER with the Note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.

IN WITNESS WHEREOF, MERS, as nominee for Optima Mortgage Corporation has caused these presents to be signed by its duly authorized officer and its corporate seal to be hereunto affixed, this _____ day of _____, 2006

IN THE PRESENCE OF:                          MERS, as nominee for Optima Mortgage Corporation


MELISSA FLANAGAN                             AMANDA FARRAR, ASSISTANT VICE PRESIDENT


STATE OF _____ **TEXAS**
County of _____ **COLLIN**

On 11/20/06 _____ before me, Amanda Farrar _____ personally appeared AMANDA FARRAR, ASSISTANT VICE PRESIDENT _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


KRISTA L. EDWARDS
MY COMMISSION EXPIRES
April 20, 2009

NOTARY PUBLIC SIGNATURE                      NOTARY PUBLIC SEAL

LcP-11-9/05

# EXHIBIT 7

WHEN RECORDED MAIL TO:

OPTIMA MORTGAGE CORPORATION
15941 REDHILL AVENUE SUITE #100
TUSTIN, CALIFORNIA 92780

ATTN: QUALITY CONTROL

Loan Number: 0640520009
Servicing Number:

[Space Above This Line For Recording Data]

# Assignment of Mortgage

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to COUNTRYWIDE DOCUMENT CUSTODY SERVICES, A DIVISION OF TREASURY BANK, N.A., 1800 TAPO CANYON RD., SIMI VALLEY, CA 93063
all beneficial interest under that certain Mortgage dated JUNE 22, 2004                                   executed by
PAUL JONES

                                                                                                                    , Mortgagor
and recorded as Instrument No.                      concurrently herewith on                      in book          ,
page                          , of Official Records in the County Recorder's office of NORFOLK                    County,
MASSACHUSETTS                                                                      , describing land therein as
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

Commonly known as: 572 PARK STREET, STOUGHTON, MASSACHUSETTS 02072

Assessor's Parcel #: MAP 70 MAP 42
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.
OPTIMA MORTGAGE CORPORATION, A CALIFORNIA CORPORATION

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Attest _____          Attest _____

STATE OF <u>MASSACHUSETTS</u> _____

COUNTY OF <u>NORFOLK</u> _____ SS.
On                                                before me,

personally appeared _____

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)        (This area for Corporate Seal)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _____

_____
Name (Typed or Printed)                      (This area for official notarial seal)
Notary Public in for said State

USMS0181 (02-03-94)

WHEN RECORDED MAIL TO:

OPTIMA MORTGAGE
CORPORATION
15941 REDHILL AVENUE
SUITE #100
TUSTIN, CALIFORNIA
92780
Loan Number:
0640520008

---

[Space Above This Line For Recording Data]

# ASSIGNMENT OF MORTGAGE

**FOR VALUE RECEIVED,** MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
("MERS") AS NOMINEE FOR OPTIMA MORTGAGE CORPORATION ITS SUCCESSORS AND
ASSIGNS, HEREBY ASSIGN AND TRANSFER TO

ALL ITS RIGHT, TITLE AND INTEREST IN AND TO A CERTAIN MORTGAGE
EXECUTED BY PAUL JONES

and bearing the date of the
and recorded as Instrument No. _____ concurrently herewith on _____
In book _____ , page _____ , of Official Records in the County Recorder's office of
MASSACHUSETTS County, NORFOLK _____ , describing land therein as:
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS
EXHIBIT "A"
A.P.N. #: MAP 70 MAP 42

Commonly known as: 572 PARK STREET, STOUGHTON, MASSACHUSETTS 02072

Assessor's Parcel #: MAP 70 MAP 42
**TOGETHER** with the note or notes therein described or referred to, the money due and to become due thereon with interest,
and all rights accrued or to accrue under said Mortgage.

| | |
|---|---|
| | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") |
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Attest | Attest |

STATE OF _MASSACHUSETTS_____

COUNTY OF _NORFOLK_____ SS.
On _____ before me,

personally appeared _____

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s)
or the entity upon behalf of which the person(s) acted,
executed the instrument.
WITNESS my hand and official seal.

Signature _____

(This area for Corporate Seal)

_____
Name (Typed or Printed)
Notary Public in for said State

(This area for official notarial seal)

MIN: 1002547-0640520008-3     MERS Phone: 1-888-679-6377

---

ASSIGNMENT OF MORTGAGE

DocMagic €Forms 800-649-1362
www.docmagic.com

# EXHIBIT 8

Bk 25529 Ps356 #16182
02-25-2008 ⓐ 11:25a

# ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS, that MERS, as nominee for Optima Mortgage Corporation, which is organized and existing under the laws of United States of America

FOR VALUE RECEIVED, hereby grants, assigns and transfers to

Bank of New York as Trustee for the Certificate Holders, CWABS, Inc., Asset-Backed Certificates, Series 2004-7, located in Simi Valley, CA 93065

All of the right, title, interest of said that MERS, as nominee for Optima Mortgage Corporation in and to and under that certain Mortgage dated June 22, 2004, executed by Paul Jones and recorded with Norfolk County () Registry of Deeds at Book 22224, Page 219, describing the land therein as 572 Park Street, Stoughton, MA 02072, and further described in the Exhibit "A" attached hereto and made a part hereof;

TOGETHER with the Note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.

IN WITNESS WHEREOF, MERS, as nominee for Optima Mortgage Corporation has caused these presents to be signed by its duly authorized officer and its corporate seal to be hereunto affixed, this 10th day of October, 2006.

IN THE PRESENCE OF:                  MERS, as nominee for Optima Mortgage Corporation

_Paula Meyer_
Paula Meyer

_Jillany Skalfe_
Tiffany Skalfe, Asst. Secretary

STATE OF _TEXAS_
County of _COLLIN_

On _01-25-2008_ before me, _Tiffany Skalfe_ _____ personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Paula_
NOTARY PUBLIC SIGNATURE

SANDRA J ROBINSON
My Commission Expires
March 15, 2011
NOTARY PUBLIC SEAL

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY
_William P O'Donnell_
WILLIAM P. O'DONNELL, REGISTER

21

# EXHIBIT 9



# ᴛʜᴇ TAPE TRANSCRIPTION CENTER

### A Division of THE SKILL BUREAU

## <u>CERTIFICATE</u>

I, Julia Suggs, do hereby certify the following 34 pages to be a true and accurate transcription.  Prepared under my direction in the Tape Transcription Center to the best of our abilities, the document comprises a tape provided to us by Mr. Paul Jones.  The tape is labeled "Bank of New York v. Paul Jones" and consists of three hearings in the Stoughton Distric Court in the case of Bank of New York v. Paul Jones on March 13, 2008, July 31, 2008, and August 11, 2008, under docket numbers 2008SU17, 2008SU118, and 2008SU48.

_10/17/2008_
Date

_Julia Suggs_
Julia Suggs
Tape Transcription Center

129 Tremont Street · Boston, MA 02108
**Tel:** 617.423.2151  **Fax:** 617.423.9183
www.ttctranscriptions.com
The fastest turnaround time in New England since 1966.

Bank of New York v Paul Jones, 3/13/2008                    PAGE 1

Stoughton District Court, Docket #200855SU17

1    _:   And we have Bank of New York versus Paul Jones.

2    _:   Good morning, Your Honor.

3    J:   Good morning.

4    CULLEN:   Good morning, Your Honor.   John F. Cullen for the

5         defendant.

6    J:   I'm sorry.   What's your name again, Counsel.

7    CULLEN:   Cullen.   C-U-L-L-E-N, John F.

8    J:   All right.

9    CULLEN:   Your Honor, I've spoken with counsel outside and I'm

10        making a motion to dismiss the case on several grounds

11        (inaudible).   My brother was not given by his client my

12        answer or the case law.   This is the second time this case

13        has been here in 90 days.   The first time --

14   J:   Excuse me.

15   CULLEN:   -- the case was dismissed by the cou -- by the court.

16        Excuse me.   You all set?

17   J:   Um-hmm.

18   CULLEN:   OK.

19   J:   Yes.

20   CULLEN:   It was dismissed by the court and the court allowed

21        counsel for the -- for the plaintiff at that point of time

22        to withdraw his appearance to avoid sanctions because of a

23        failure to follow the Rules of Civil Procedure in the

24        following case and not properly recording the -- the

Bank of New York v Paul Jones, 3/13/2008                    PAGE 2

Stoughton District Court, Docket #200855SU17

1       foreclosure deed.  Now, in this case, we're in it the

2       second time, yet the statute 18 -- Mass General Laws

3       Chapter 181(6), the 14-day notice to quit was never served

4       in this case.  Secondly, on February 9th, and as my answer

5       indicates, the plaintiff served on the defendant the

6       complaint for eviction.  On the 25th of February, the

7       plaintiff then recorded a foreclosure deed.  OK.  This is

8       seven months after the foreclosure sale.  Now, between the

9       19th and the 25th, the defendant had no opportunity to

10      respond or to ask questions as to why he was being sued

11      because the plaintiff had to file with the court.  They

12      didn't file the complaint with the court until March 3rd.

13      Between March 19th and March 3rd, there was no --

14  J:  You mean February 19th?

15  CULLEN:   February 19th to March 3rd.

16  J:  19th to March 3rd?

17  CULLEN:   Yes.

18  J:  OK.

19  CULLEN:   So there's no complaint.  So on those grounds, it has

20      to be dismissed as a matter of law under Rule 11 and 12 of

21      Massachusetts Rules of Procedure -- Civil Procedure.  They

22      once again failed to comply with the rules.  They've been

23      warned the last time by this court, if they failed to

24      follow the rules, common law sanctions would be sanctioned

Bank of New York v Paul Jones, 3/13/2008          PAGE 3

Stoughton District Court, Docket #200855SU17

1       against them for their conduct of not following the rules

2       and not protecting the interest of the defendant and the

3       due process right.

4    J:  Counsel?

5    M1: If Your Honor please, I'm -- I was not aware of all these

6       facts until counsel (inaudible) paper.  I was covering the

7       matter with outside counsel.  It is -- it is --

8    J:  And you're not happy that you're doing it right now?

9    M1: No, not at all, Your Honor.  I've represented these --

10      this firm before and this is the first time I've been in a

11      situation like this, in all honest, Your Honor.  This

12      appears to rise out of a foreclosure action, as far as I

13      know, as far as you and I can see.  And that's based on --

14      I'm not going to object to my brother's dismissal.

15   J:  OK.

16   M1: Obviously on the basis of what he filed or obviously want

17      the office to have -- get these copies, which they may

18      have, I'm not sure, and have a chance to review it and

19      deal with it at their end.

20   CULLEN:  Your Honor, this -- this was marked down for a trial

21      by the court for a particular reason.  That it involved a

22      (inaudible) complaint, they would mark it down for trial.

23      But the reason is that there are no witnesses.  They're

24      unable to show that in fact they are the holder of a

Bank of New York v Paul Jones, 3/13/2008                    PAGE 4

Stoughton District Court, Docket #200855SU17

```
1        (inaudible) mortgage.  This came up the first time and

2        that's why the counsel who was representing the moving

3        party at that time withdrew.  They have no evidence

4        whatsoever.  Not one scintilla of evidence that, in fact,

5        that they own the mortgage and there was a rightful

6        foreclosure sale.  But putting that aside, the is -- the

7        (inaudible) complaint has to be dismissed as a matter of

8        law.  The question is whether the court will -- as the

9        court suggested before, impose certain conditions if a

10       second complaint or a third complaint is filed.  In other

11       words, case law from the court of appeals going way back

12       to 1919, with reference to the subsequent case...

13  J:   So I've never seen one like this where the --

14  CULLEN:   Well, it's interesting.  I talked with the clerk's

15       office because I was going to call them as a witness if we

16       went to trial, OK.  And the clerk's office tells me the

17       consistent policy with this clerk's office is that the

18       moving party types out the complaint, OK, and then comes

19       in, files it on the date that they decided, OK.  So that

20       then the ten-day period begins to commence.  No one has

21       ever seen a complaint where the defendant in this case has

22       been served prior to filing his complaint.

23  J:   Right.  And that's what -- that's what's really unusual

24       about it.
```

Bank of New York v Paul Jones, 3/13/2008                    PAGE 5

Stoughton District Court, Docket #200855SU17

1    CULLEN:   Well, I think -- I think, Your Honor, to -- to

2             explain it, there have been a series of missteps by this

3             firm all the way through this case, including the

4             foreclosure.  Now, this is a -- now, this is another one

5             that (inaudible) this plaintiff and they can't proceed

6             because they don't have the mortgage.  They -- they've

7             alleged at the beginning, when the court asked them,

8             "Where's the mortgage?" "I don't know.  We don't have it."

9             Well, you can't proceed with a foreclosure action -- and I

10            -- I told them at the foreclosure sale that they had no

11            right to move.  That's a separate action, a distinct civil

12            procedure action against the New York Bank and the law

13            firm.  The only thing that's before it is the eviction.

14            Now, the question that I raise is the question of whether

15            the court will impose common law sanctions based on the

16            fact that this is -- this is absolutely outrageous conduct

17            to come into a court, file a complaint, and then secondly

18            not explain to the court...  It's actually, as you know,

19            there's a mandatory (inaudible) to the court.  This is a

20            false statement to the judicial panel, which is in fact a

21            misdemeanor.  And also with sanctionable -- sanctionable

22            under the bar -- BBO.  In -- unfortunately, my brother is

23            in front of the situate -- what they do is they find some

24            attorney that they call on the phone who knows nothing

Bank of New York v Paul Jones, 3/13/2008                    PAGE 6

Stoughton District Court, Docket #200855SU17

1        about the case, the second time, and they say that I'm

2        here only (inaudible).

3   J:   Do you have a written motion, Counsel, for a motion to

4        dismiss?

5   CULLEN:   I -- I don't.

6   J:   Or just the answer here?

7   CULLEN:   I have the answer.  I can turn the caption of the --

8        of the answer into a motion to dismiss based on the facts

9        contained in the answer.

10  J:   Well -- no.  You ask here in the -- where the defendant

11       pays that the judgment of dismissal be entered.

12  CULLEN:   That's right.  I -- I left it in the end.  Yeah.

13  J:   Yeah.  All right.  Matter will be dismissed.

14  CULLEN:   The question is whether the court will consider

15       dismissing with prejudice (inaudible).

16  J:   Well, that's what I want -- I want to read over all the --

17       the paperwork for this.  Definitely going to be dismissed.

18       If you give me a moment, I just want to read your answer

19       thoroughly.

20  CULLEN:   Thank you.

21  J:   Give me one moment.  You also rely on the 14-day notice

22       from back in December.

23  CULLEN:   Yeah.  They can't do it --

24  J:   You can't do that.

Bank of New York v Paul Jones, 3/13/2008                     PAGE 7

Stoughton District Court, Docket #200855SU17

1   CULLEN:    (inaudible) can't do it in the other case.   The

2        Appeals Court has clearly indicated -- we're -- if there

3        was a second -- if two cases were pending, then there were

4        changed circumstances.   The Court of Appeals says under

5        the changed circumstances rule, you still have to commence

6        your 181(6) procedure regardless of what's happened in the

7        past.

8   J:   Um-hmm.   The motion will be allowed.   Let's see.   Madame

9        Clerk, do we have the form for motions as opposed to

10       findings?

11  CLERK:    We have a motion form that the judge (inaudible).   I

12       mean --

13  J:   No, the --

14  CLERK:    No.

15  J:   You had -- I had one in the other one.   It was -- this is

16       the finding of the court with regard to the trial, which

17       we have not had.

18  CLERK:    Right.

19  J:   But I want --

20  CLERK:    Because of those motions (inaudible).

21  CULLEN:    (inaudible) interesting question that you raise.   Is

22       a question -- it was marked down for trial.

23  J:   I know.

Bank of New York v Paul Jones, 3/13/2008                    PAGE 8

Stoughton District Court, Docket #200855SU17

1   CULLEN:   And therefore, they -- the plaintiff -- the moving

2         party presented no witnesses, has no evidence at all, so

3         the -- there is two compounding factors.  It was whether,

4         in fact, this complaint should be dismissed or judgment

5         should be rendered for the defendant.

6   J:    Oh, that's a very interesting question, because it is

7         marked for trial.  I have a findings sheet here.  I have a

8         complaint before me.  We can call the case for trial.  I

9         don't know if counsel -- what counsel wishes to do.  But I

10        think we're putting counsel in an awkward position.

11  M1:   If Your Honor pleases, the only documentation that I have

12        other than some copies of the complaint is a copy of the

13        foreclosure deed.  And then -- I do not have the recording

14        information on it.  (inaudible) ascertainable and the only

15        comment I could make on that is that the title can't rest

16        in limbo.  When a foreclosure sale is held, the title does

17        pass at that point in time.  With all due respect to my

18        brother, I think there's -- in terms of the (inaudible) of

19        foreclosure, I think it has to be done at that time, not

20        after the fact.  But that's the only documentation I have

21        that -- at least to that end of it.  I can't speak as to

22        the eviction itself.

23  CULLEN:   Your Honor, that's not a relevant issue with

24        (inaudible).  In fact, the legislature's already dealt

Bank of New York v Paul Jones, 3/13/2008                    PAGE 9

Stoughton District Court, Docket #200855SU17

```
1        with that issue and I'm not going to get into it.  The

2        question is it was a trial set by the court.  He has no

3        evidence.  There is not evidence that he can present

4        anything to be said to the court that's not evidence and

5        it can't be taken as evidence or construed as evidence.

6        So therefore, not having evidence, I ask that the ju -- I

7        ask that the court enter a judgment for the defendant, or

8        in the alternative, dismiss the case with prejudice.

9   J:   Counsel?

10  M1:  Your Honor, I -- again, I have no additional evidence.

11  J:   OK.

12  M1:  (inaudible) situation.

13  J:   Matter will be dismissed with prejudice.  Madame Clerk, do

14       you have that -- in the other case, there was a form.

15  CLERK:   It was a motion form.

16  J:   Um... You had it in --

17  CLERK:   I -- I don't have it here because this was the

18       appeal.

19  J:   (inaudible).  I'll write it over here.

20  CLERK:   (inaudible) go down and get you one.

21  J:   (inaudible).  We have one -- we have one case left.  This

22       one here.  I'm finishing up this one, right.  This one.

23  _:   OK.

24  J:   OK.  Oh, oh.
```

Bank of New York v Paul Jones, 3/13/2008                    PAGE 10

Stoughton District Court, Docket #200855SU17

1  _:   Your Honor (inaudible).

2  J:   No.  You're not understanding, Madame Clerk.  In the other

3       file, there was a form, a court form, that says motion and

4       it allows me to write my findings, allowed or denied.

5  CLERK:   OK.  That -- we don't put that in the summary

6       process.

7  J:   There was one in the other summary process that I just

8       had.

9  CLERK:   Oh.  You know, it probably was just by accident.  But

10      I see what you're saying.

11 J:   OK.

12 CLERK:   You don't (inaudible).

13 J:   No, I'll write it on this.  All right, thank you.

14 CLERK:   OK.

15 CULLEN:   Your Honor, may I address the court?

16 J:   Yes.

17 CULLEN:   The issue of -- the issue that's raised and I'll give

18      you the case, you can read it.  There's a question now --

19      at this particular point in time, *res judicata* applies

20      under the Court of Appeals decision.  And they can't bring

21      forward another complaint unless they can show changed

22      (inaudible).

23 J:   Correct.

Bank of New York v Paul Jones, 3/13/2008                    PAGE 11

Stoughton District Court, Docket #200855SU17

1   CULLEN:   OK.  So I just want to make it clear to counsel that

2         the -- the one before, for the record, that *res judicata*

3         could become an issue under the (inaudible) case.  The

4         court (inaudible) indicated, we want this (inaudible).

5   J:   I definitely would like to take a look at the case.

6   CULLEN:   Your Honor, it's the paragraph that is circled from

7         below.

8   J:   Actually, you know what?  What I think I'll do is I think

9         I may write out a finding and have the court type it up

10        and send it out to the parties.  But it will be -- the

11        motion to dis -- the oral motion to dismiss will be

12        allowed with prejudice and I will have a written finding

13        sent out to the court -- to the parties.

14  CULLEN:   Your Honor, there are two cases (inaudible) and we'd

15        like the second case, Your Honor.  I will give it to you.

16        It's a 1913 case with (inaudible) referenced (inaudible).

17  J:   OK.  Fine.  Thank you.

18  CULLEN:   Madame Clerk.  All right.  Matter will be dismissed

19        with prejudice and a written decision will be forthcoming.

20  CULLEN:   Thank you, Your Honor.

21  END OF HEARING